UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Veronica Gonzalez, | No. 1:25-cv-1549-GSA |
| Plaintiff, | **OPINION & ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY** |
| v. | |
| Commissioner of Social Security, | (ECF Nos. 21, 23) |
| Defendant. | |

**I.    Introduction**

Plaintiff Veronica Gonzalez seeks judicial review of a final decision of the Commissioner of Social Security denying her applications for supplemental security income (SSI), and disability insurance benefits (DIB) pursuant to Titles II and XVI of the Social Security Act.

**II.    Procedural Background**

Plaintiff filed applications for a period of disability and disability insurance benefits on September 11, 2019, alleging disability commencing November 30, 2016.  The Commissioner denied the Title II claim by initial determination on February 21, 2020, and upon reconsideration on May 22, 2020.

The ALJ conducted a hearing on February 11, 2021.  AR 102–25.  The ALJ issued an unfavorable determination on April 20, 2021. AR 150–173.  Plaintiff requested review of that determination, and the Appeals Council granted the request for review on April 22, 2022.  AR

1

174–80, 243, 249–51.

A different ALJ conducted the remand hearings on August 25, 2022, and on February 6, 2023, and the ALJ issued an unfavorable decision on March 31, 2023. AR 14–42, 43–52, 53–101. The Appeals Council denied the review on December 18, 2023. AR 1–6.  Plaintiff then filed a complaint in this Court and the Court remanded the case on August 16, 2024. AR 2504– 05.

Another ALJ presided over the hearing on remand on July 23, 2025, issuing an unfavorable decision on September 9, 2025. AR 2417–58, 2459–88.  On November 9, 2025, the ALJ decision became the final decision of the Commissioner (42 U.S.C. § 405(h)) and this appeal followed.

**III.    The Disability Standard**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a Claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but it is less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation and quotations omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted).  If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the Agency's decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his/her physical or mental impairment or impairments are of such severity that s/he is not only unable to do his/her previous work, but cannot, considering his/her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which s/he lives, or whether a specific job vacancy exists for him/her, or whether s/he would be hired if s/he applied for work.  42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for an ALJ to employ when evaluating the alleged disability of a claimant.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: 1- whether the claimant has engaged in substantial gainful activity during the period for which Plaintiff is alleging he or she experiences a disability; 2- whether the claimant has a medically determinable "severe impairments" affecting the claimants ability to perform basic work activities; 3- whether these impairments meet or are medically equivalent to one of the listed impairments set forth in the agency's regulations (20 C.F.R. § 404, Subpart P, Appendix 1); 4- whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work; and 5- whether the claimant has the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given the claimant's RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

## IV.    The ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 30, 2016, the alleged disability onset date. AR 2424. At step two, the ALJ found that Plaintiff had severe impairments of: carpal tunnel syndrome, osteoarthritis of the right thumb, and obesity. AR 2424.  For the Title XVI claim, the ALJ found the same severe impairments with the addition of degenerative disc disease, obstructive sleep apnea, and venous insufficiency. Id.

At step three, the ALJ found that the impairments did not meet or equal any listed impairment. AR 2426.  For the Title II period, the ALJ found Plaintiff had the RFC to perform light exertional work except:

> she can frequently push and pull with the bilateral upper extremities, can frequently handle and finger with the bilateral upper extremities, must avoid concentrated exposure to extreme cold and vibration, and must avoid all exposure to hazards. unprotected heights, hazardous machinery, or excessive vibrations.  AR 2427.

For the Title XVI period, the ALJ found Plaintiff retained the RFC to perform light exertional work except:

> she cannot climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and must avoid concentrated exposure to hazards, extreme cold and vibration. She can frequently push and pull with the bilateral upper extremities and can frequently handle and finger with the bilateral upper extremities.  AR 2427.

At step four, the ALJ found Plaintiff could not perform her past relevant work. AR 2442. At step five, in reliance on the VE's testimony, the ALJ found that an individual with Plaintiff's vocational profile could perform the following jobs existing in significant numbers in the national economy: cashier II (DOT 211.462-010), cleaner, housekeeping (DOT 323.687- 014), and retail marker (DOT 209.587-034). AR 2442.  The ALJ thus concluded that Plaintiff did not suffer from a disability between the alleged disability onset date of November 30, 2016, through the date of the decision. AR 2444.

## V.    Issues Presented

Plaintiff asserts two claims of error: 1- "The ALJ failed to properly consider the medical opinion of Dinsch Sharma, M.D., QME" (MSJ at 16); and 2- "The ALJ failed to articulate clear

4

and convincing reasons, supported by substantial evidence, for rejecting Gonzalez's hand pain and limitation testimony."  (MSJ at 16).

### A.    Medical Opinion; RFC (Claim 1)

#### 1.    Applicable Law

Before proceeding to steps four and five, the ALJ determines the claimant's residual functional capacity (RFC) which is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. § 416.945(a)(1).  The RFC must consider all of the claimant's impairments, severe or not.  20 C.F.R. §§ 416.920(e), 416.945(a)(2). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

For applications filed on or after March 27, 2017, new regulations eliminate a hierarchy of medical opinions and provide that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Instead, when evaluating any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization and other factors.  20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and the agency will articulate how the factors of supportability and consistency are considered.  Id.  "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." Woods v. Kijakazi, 2022 WL 1195334, (9th Cir. Apr. 22, 2022) at *6.

With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).  Regarding "consistency," the regulations provide that "[t]he more consistent a

medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

**2.      Analysis**

After a thorough factual summary, Plaintiff provides a concise argument that can be quoted in full:

> As part of Gonzalez's workers compensation case, Dinesh Sharma, M.D., evaluated Gonzalez as the [QME] on three occasions: . . . Dr. Sharma opined that:
>
>> Permanent work restrictions are the same. She is precluded from forceful and repetitive use of the bilateral upper extremities and no pushing and pulling greater than 15 pounds.
>
>> . . .
>
> While the ALJ found the 15-pound limitation inconsistent and overly restrictive, the ALJ found the other part of the opinion "generally supported by the treatment notes" . . . positive Tinel's, reduced sensation to her hands, but full mobility of her wrist, no atrophy, and mood muscle bulk, tone and strength in her upper extremities…[and that those] findings generally supported the opinion…" Id. Thus, the ALJ found Dr. Sharma's opinion persuasive that Gonzalez was precluded from forceful and repetitive use of the bilateral upper extremities. The ALJ must consider the context in which Dr. Sharma expressed a medical opinion about the ability of Gonzalez to function. Desrosiers v. Secretary Health and Human Services, 846 F.2d 573, 576 (9th Cir. 1988) (requiring ALJ to consider the terms of art from workers' compensation; no heavy work for workers' compensation does not permit DOT medium work). While the ALJ acknowledged that Dr. Sharma was the QME, the ALJ failed to explain what Dr. Sharma meant when restricting Gonzalez from no forceful and repetitive use of the bilateral upper extremities.
>
> The Schedule for Rating Permanent Disabilities (Cal. Dept. of Ind. Rel. April 1997) defines a disability precluding repetitive motion of the neck as "contemplates the individual has lost approximately 50% of pre-injury capacity for flexing, extending, bending, or rotating neck." Id. at p.2-14. That definition of repetitive as implying a 50% loss of pre-injury capacity applies to upper extremity impairments. Id. at p.1-13. Thus, Dr. Sharma opined Gonzalez lost 50% of preinjury capacity for using her bilateral upper extremities. Assuming Gonzalez had 100% capacity pre-injury to use her bilateral upper extremities to handle and finger, Dr. Sharma necessarily opined that Gonzalez could only use both of her upper extremities up to 50% of the day.
>
> However, despite the ALJ finding the aforementioned portion of Dr. Sharma's medical opinion persuasive, the ALJ found Gonzalez could engage in

frequent bilateral handling and fingering which Social Security defines as occurring from one-third to two-thirds of the time—up to two-thirds of the day. SSR 83-10. As written, a limitation permitting handling and fingering up to two-thirds of the day conflicts with Dr. Sharma's opinion that Gonzalez could only use her bilateral upper extremities for 50% of the day.[1]

When the RFC assessment conflicts with an opinion from a medical source, the ALJ "must explain why the opinion was not adopted." SSR 96-8p. The ALJ did not explain the rejection of that pertinent part of Dr. Sharma's medical opinion by simultaneously finding that part of Dr. Sharma's opinion persuasive and generally supported by the treatment notes. AR 2438. By neither adopting nor explaining such rejection, the ALJ erred.

The ALJ's error was harmful because the DOT reports that all three jobs identified at step five require frequent handling and two of the three jobs require frequent fingering. AR 2442, ¶ 10; DICOT 211.462-010; 323.687-014; 209.587-034. If Gonzalez could not perform the full range of frequent handling and fingering with his bilateral hands, it is unknown if Gonzalez could perform the work identified at step five. Because the impact of that limitation is not clear on this record, the Court should reverse and remand for further proceedings.
MSJ at 16–19

To begin, Plaintiff appears to accept the ALJ's rejection of Dr. Sharma's pushing and pulling weight restriction of 15 pounds.  Beyond this acceptance lies the core of Plaintiff's First Claim which centers on the ALJ's finding that Dr. Sharma's opinion was "generally supported by the treatment notes."  Dr. Sharma's opinion was contained in a Qualified Medical Evaluation (QME) that was part of Plaintiff's California Workers Compensation proceeding.  The relevant part of Dr. Sharma's opinion, which is at issue here, precluded Plaintiff from the "forceful and repetitive use" of her bilateral upper extremities.  As a result, Plaintiff asserts that due this ALJ's finding that Dr. Sharma's opinion was "generally supported", the ALJ was required to explain what was meant by the term "forceful and repetitive use" and then to either incorporate it into the RFC or explain why it wasn't.

Given Plaintiff's argument, it is helpful to first recognize that the terminology "used in the California workers' compensation guidelines [is] not equivalent [*11]  to Social Security

---

[1] Social Security defines fingering "Picking, pinching, or otherwise working with the fingers primarily" and defines handling as "Seizing, holding, grasping, turning, or otherwise working with the hand or hands." POMS DI 25001.001A.31, 36.

disability terminology." Booth v. Barnhart, 181 F. Supp. 2d 1099, 1104 (C.D. Cal. 2002) (citing Desrosiers v. Sec'y, 846 F.2d 573, 576 (9th Cir. 1988)).  An ALJ must consider the distinctions between workers' compensation and social security disability terminology. See Desrosiers, 846 F.2d at 576; Booth, 181 F. Supp. 2d at 1109 (ALJ erred when he failed to adequately translate physician's workers' compensation terms into Social Security terms); Payan v. Chater, 959 F. Supp. 1197, 1204 (C.D. Cal. 1996) (ALJ's failure to consider distinction between workers' compensation and social security terminology was error). An "ALJ must 'translate' [workers' compensation] terms of art contained in [] medical opinions into the corresponding Social Security terminology in order to accurately assess the implications of those opinions for the Social Security disability determination." Booth, 181 F. Supp.2d at 1106. "While the ALJ's decision need not contain an explicit 'translation,' it should at least indicate that the ALJ recognized the difference between the relevant state workers' compensation terminology, on the one hand, and the relevant Social Security disability terminology, on the other hand, and take those differences into account." Id. In addition, an ALJ is also "entitled to draw inferences 'logically flowing from the evidence.'" Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996) (quoting Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982)).

See, Alicia R. v. Saul, 2020 U.S. Dist. LEXIS 182466, at *10-11 (C.D. Cal. Sep. 30, 2020)

Which this in mind, the ALJ here was required to: 1- consider the fact that Dr. Sharma's opinion was rendered in a worker's compensation proceeding; 2-recognize the difference between California's worker's compensation terminology and the relevant Social Security disability terminology; and 3- then take those differences into account when evaluating the medical evidence.  See Pedro G. v. Saul, No. ED CV 20-818-E, 2021 U.S. Dist. LEXIS 16597, at *5-6 (C.D. Cal. Jan. 28, 2021); Desrosiers v. Secretary, 846 F.2d 573, 576 (9th Cir. 1988) (finding ALJ's interpretation of treating physician's opinion erroneous where the ALJ failed to

consider the distinction between the workers' compensation system and the Social Security

disability system); See <u>Booth v. Barnhart</u>, 181 F. Supp. 2d at 1106 ("While the ALJ's decision

need not contain an explicit 'translation[]' [of terms,] it should at least indicate that the ALJ

recognized the differences between the relevant state workers' compensation terminology . . . and

the relevant Social Security disability terminology, . . . and took those difference into account in

evaluating the medical evidence."

Defendant argues, in pertinent part, as follows:

As the ALJ explained, this opinion was "generally supported" by Dr. Sharma's treatment notes which "indicated that the claimant had positive Tinel's, reduced sensation to her hands, but full mobility of her wrist, no atrophy, and [g]ood muscle bulk, tone and strength in her upper extremities." Tr. 2438 (citing Tr. 2140–41). However, the ALJ found the "opinion was somewhat overly restrictive, and thus inconsistent, in the limitation with respect to the pushing and pulling limitation, based on the reasons and mitigating findings in the record mentioned above[.]" Tr. 2437 (citing, e.g., Tr. 669, 673, 676–77, 2166–2184, 2191–2207).

As the ALJ had explained earlier in his decision, the record demonstrated that physical examinations "often revealed no signs of atrophy or asymmetry, and [Plaintiff] demonstrated good fine finger motor control." Tr. 2426 (citing, e.g., Tr. 669, 673, 676–77, 2166–2184, 2191–2207), Tr. 2432 (citing Tr. 686–704, 2154–64, 2191–2207). Exams also showed, for instance, that while Plaintiff had tenderness to palpation to her carpal tunnel, she had no gross deformities of the wrist, normal or 4/5 diminished strength, and range of motion that was diminished in extension but otherwise within normal limits. Tr. 2426. During the Title XVI period, Plaintiff had reduced wrist range of motion and 4/5 strength for grip and finger abduction on the left but sustained grip is $3/5^2$ otherwise 5/5, suggesting intact right extremity strength. Tr. 2426 (citing Tr. 3571, 3691, 4021, 4031, 4036). During the October 2023 consultative examination, Plaintiff had full grip and muscle strength of both upper extremities, with normal muscle bulk and tone, and she had intact sensation and deep tendon reflexes. Tr. 2426 & 2435 (citing Tr. 3162)

Diagnostic imaging, EMG, and nerve conduction studies of both hands also revealed many mitigating findings. Tr. 2429 (citing Tr. 691(May 2017 EMG revealed mildly abnormal nerve conduction affecting the sensory fibers, with the

[2] 3/5 is somewhere between full strength and no strength. <u>See</u> https://www.merckmanuals.com/professional/neurologic-disorders/neurologic-examination/how-to-assess-muscle-strength (0: No visible muscle contraction; 1: Visible muscle contraction with no or trace movement; 2: Limb movement, but not against gravity; 3: Movement against gravity but not resistance; 4: Movement against at least some resistance supplied by the examiner; 5: Full strength

left side slightly greater than the right, but both mild), Tr. 2431 (citing, e.g, Tr. 2338 (May 2016 CT scan of right wrist revealed "mild" degenerative changes with "slight" widening of the scapholunate interval), 676 (November 2016 MRI of right thumb revealed only "mild" degenerative arthrosis), 676–77 & 2408 (November 2016 MRI of right wrist showed "trace" tenosynovitis of the palmar bursa, and findings of ulnar abutment and lobular ganglion cyst similar to the prior scan, but her physician noted that her cyst was "small" and without need of intervention), 676 & 2337 (2017 EMG showed "mild" carpal tunnel syndrome in right hand with no involvement of motor fibers noted), 669 (June 2017 and April 2019 EMGs revealed distant right medial nerve injury without denervation, and no evidence of radial tunnel syndrome, peripheral neuropathy, cervical radiculopathy, or plexopathy), 2407 (treating physician reported that the nerve conduction study was "completely normalized" and her diagnostic studies had improved)).

Based on the overall record, the ALJ reasonably found that the medical evidence supported a finding that Plaintiff would be able to perform a range of light work, except frequently push/pull and handle/finger bilaterally (Tr. 2427)— in contrast to Dr. Sharma's overly restrictive opinion. Plaintiff argues the ALJ erred because the RFC limitation to frequent handling/fingering conflicts with the part of Dr. Sharma's opinion that precluded Plaintiff from forceful and repetitive use of her bilateral upper extremities. ECF No. 21 at 17–19. In so arguing, she relies on the definition of "repetitive" under workers' compensation guidelines as it pertains to a neck injury. Id. at 18. This argument is unconvincing as it relies on workers' compensation disability ratings which are not dispositive on the Social Security Administration's finding on disability. In any event, any error would be harmless as Dr. Sharma's "forceful and repetitive use" phrase is vague, and an ALJ is not required to incorporate limitations phrased equivocally into the RFC. See Valentine v. Comm' r Soc. Sec. Admin., 574 F.3d 685, 691–92 (9th Cir. 2009); see also Ford v. Saul, 950 F.3d 1141, 1154 (9th Cir. 2020) (a reviewing court "may affirm the ALJ's decision even if the ALJ made an error, so long as the error was harmless, meaning it was inconsequential to the ultimate nondisability determination.").

Despite Defendant's numerous references to Plaintiff's diagnostic findings, the ALJ was still required to properly translate Dr. Sharma's opinion. "While the ALJ's decision need not contain an explicit 'translation,' it should at least indicate that the ALJ recognized the difference between the relevant state workers' compensation terminology, on the one hand, and the relevant Social Security disability terminology on the other hand, and take those differences into account." Booth v. Barnhart, 181 F. Supp.2d 1099 at 1106 (C.D. Cal. 2002).

As for Defendant's argument that Dr. Sharma's opinion "relies on workers' compensation disability ratings which are not dispositive on the Social Security Administration's

finding on disability," while true, it is also true that an ALJ may not dispense with or superficially consider "a physician's medical opinion simply because it was initially elicited in a state workers' compensation proceeding, or because it is couched in the terminology used in such proceedings." Booth v. Barnhart, supra.   An ALJ must evaluate workers' compensation opinions just as he or she would evaluate any other medical opinion and must "translate" workers' compensation terminology into Social Security terminology to accurately assess the implications of those opinions for the Social Security disability determination.  Id.; Soria v. Berryhill, No. 1:18-CV-00089-SKO, 2019 WL 2448435, at *11 (E.D. Cal. June 12, 2019); Herlinda C. v. Saul, No. CV 19-2730 AGR, 2020 WL 6287716, at *4 (C.D. Cal. Oct. 27, 2020).

Defendant further contends that Dr. Sharma's stated limitation of "forceful and repetitive use"  is "vague" and "equivocal," but as Plaintiff  explains, "The Schedule for Rating Permanent Disabilities (Cal. Dept. of Ind. Rel. April 1997) defines a disability precluding repetitive motion of the neck as "contemplates the individual has lost approximately 50% of pre-injury capacity for flexing, extending, bending, or rotating neck" (Id. at p.2-14), and "that definition of repetitive as implying a 50% loss of pre-injury capacity applies to upper extremity impairments." Id. at p.1-13.  Specifically,

> In the workers' compensation context, repetitive contemplates a reduction of 50% or more of the time. See Cal. Code of Regs. tit. 8 § 5110(a)(1); Schedule for Rating Permanent Disabilities (Labor Code of California 1997), available at www.dir.ca.gov/dwc/PDR1997.pdf;7see also Ismael A. v. Berryhill, 2018 U.S. Dist. LEXIS 214545, 2018 WL 6697178, at *3 (C.D. Cal. Dec. 19, 2018) (finding in the workers' compensation context, a preclusion from repetitive activity contemplates a 50% reduction from pre-injury capacity); Gamache v. Colvin, 2014 U.S. Dist. LEXIS 154801, 2014 WL 5511210, at *1 (C.D. Cal. Oct. 31, 2014) (same); Brooks v. Astrue, 2012 U.S. Dist. LEXIS 86981, 2012 WL 2373628, at *5 (C.D. Cal. June 22, 2012) (same). Repetitive is not defined in the social security disability context.
> See, Alicia R. v. Saul, supra

Plaintiff continues:

> Dr. Sharma opined Gonzalez lost 50% of preinjury capacity for using her bilateral

11

upper extremities. Assuming Gonzalez had 100% capacity pre-injury to use her bilateral upper extremities to handle and finger, Dr. Sharma necessarily opined that Gonzalez could only use both of her upper extremities up to 50% of the day.

Plaintiff concludes:

Despite the ALJ finding the aforementioned portion of Dr. Sharma's medical opinion persuasive, the ALJ found Gonzalez could engage in frequent bilateral handling and fingering which Social Security defines as occurring from one-third to two-thirds of the time—up to two-thirds of the day. SSR 83-10.

Thus, because Dr. Sharma's opinion did include the limitation of "forceful and repetitive use of the bilateral upper extremities",  meaning 50% loss of function,  being contrary to the limitation expressed in the RFC, e.g.,  Social Security Ruling 83-10  defining the term frequent as a limitation permitting handling and fingering from one-third of an 8-hour day up to two-thirds of the day (SSR 83-10),  it required the ALJ to  have taken those differences into account when evaluating the medical evidence and  formulating the RFC, which was not done.   As another court has similarly explained:

Dr. Kim's opinion that plaintiff should avoid repetitive grasping and gripping would seem to preclude her from jobs that require grasping and gripping more than 50% of the time. The ALJ's effective finding that plaintiff could perform jobs that require grasping and gripping more than 50% but less than 67% of the time therefore disregards Dr. Kim's contrary opinion. Although defendant correctly notes it is the province of the ALJ to interpret the evidence and translate the term, there is no indication the ALJ here recognized the distinction and translated the term. As such, the ALJ implicitly rejected this portion of Dr. Kim's opinion without providing a specific and legitimate, or any, reason.

Alicia R. v Saul, 2020 U.S. Dist. LEXIS 182466, at *13.

In sum, the ALJ committed harmful error when finding Dr. Sharma's opinion was generally supported by the treatment notes yet omitting from the RFC either an accommodation for the restriction of "forceful and repetitive use of the upper extremities," or explaining its absence.

Thus, the RFC is unsupported by substantial evidence.

**B.    Subjective Symptoms (Claim 2)**

### 1.    Applicable Law

Before proceeding to steps four and five, the ALJ determines the claimant's residual functional capacity (RFC) which comprises the most that a claimant is still capable of doing despite the claimant's particular limitations.  This RFC represents an assessment "based on all the relevant evidence" contained within the Certified Administrative Record.  20 C.F.R. § 416.945(a)(1).  The residual functional capacity must consider all of the claimant's impairments, whether those impairments are severe or non-severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings."  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

An ALJ performs a two-step analysis to determine whether a Plaintiff's testimony regarding subjective pain or symptoms is credible.  *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); Smolen, 80 F.3d at 1281; S.S.R 16-3p at 3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014; Smolen, 80 F.3d at 1281– 82.  If the claimant satisfies the first step and the ALJ finds that there is no evidence of malingering in the record, the ALJ must then evaluate the intensity, persistence and limiting effects of the claimant's symptoms to determine the extent to which those symptoms limit the individual's ability to perform work-related activities.  S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons.  *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p at *10.  Subjective testimony cannot be rejected on the sole ground that the testimony is not entirely corroborated by the objective medical evidence in the record.  Nevertheless, the medical evidence is still a relevant factor in determining the severity of Claimant's pain and its disabling effects.  See, *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

In addition, other factors considered are: 1- daily activities; 2- the location, duration,

13

frequency, and intensity of pain or other symptoms; 3- any applicable precipitating and aggravating factors; 4- the type, dosage, effectiveness, and side effects of any prescribed medication; 5- treatment other than medications that the claimant receives; 6- any other measures the claimant uses to relieve pain or other symptom;  and 7- other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. See, 20 C.F.R. § 416.929(c)(3).

### 2.     **Analysis**

Plaintiff explains:

> Gonzalez cannot work due to her hand pain. AR 117, 2471. Gonzalez testified that her hands had not improved post-surgery as she has sensation loss in the three fingers of both hands and she cannot hold the phone as it will fall out of her hands. AR 75, 117–18. She cannot peel a potato and can only use her hands five to ten minutes at a time. AR 76. She cannot drive freeways because she cannot hold onto the wheel that long. Id. While Gonzalez can cook a little, such as scrambling eggs, she does not do most of the cooking anymore because her children do. AR 76, 82. While Gonzalez can scramble eggs, she must stop after a few minutes. AR 83. It is not that Gonzalez does not have use of her hands, but rather, she must limit use of her hands because her hands get numb and she loses sensation. AR 82. When adding up the period of five to ten minutes that Gonzalez uses her hands, Gonzalez can use her hands for up to an hour a day based upon her home activities and her hands hurt once she starts doing things. AR 78–79, 80–81. Additionally, she did not discuss her hand condition with her primary care doctors due to workers compensation. AR 81–82.

> MSJ at 20.

> The ALJ discounted Gonzalez's testimony stating that the hand diagnostic and nerve conduction studies had "many mitigating factors," essentially discounting the findings as mild and trace. AR 2431. The ALJ stated that her treating physician noted her nerve conduction studies had "completely normalized." AR 2431–32 However, in September 2022, Dr. Erfanian actually stated that Gonzalez's "clinical symptoms appear to have gotten worse however her diagnostic studies have improved" and Dr. Erfanian proceeded with a cortisone injection of the right carpal tunnel. AR 2407–08.

> MSJ at 21–22.

Dr. Erfanian's exact statement is as follows:

> The nerve test is completely normalized. We may consider a cortisone injection however this may not completely resolve or even improve her symptoms.  Her clinical symptoms appear to have gotten worse however her diagnostic studies

have improved.

AR 2407 (emphasis added).

To begin, the diagnostic findings and nerve conduction studies were in fact mostly mild or trace with one exception of a mild to moderate finding.  This one exception was also very early in the record, specifically on July 7, 2016, whereas the diagnostic findings of mild and trace start there and continue through 2022.  This can be ascertained from Plaintiff's own summary of this evidence:

> .A CT scan of the right wrist from May 9, 2016, showed mild degenerative change with slight widening of the scapholunate interval. AR 712, 1276.
> . . .
> An EMG/NCS (Electromyogram/Nerve Conduction Study) on July 7, 2016, showed mild to moderate right carpal tunnel syndrome. AR 629, 1126–1128.
> . . .
> An MRI of the right wrist from November 22, 2016, showed ulnocarpal abutment with a subcortical cyst and . . . trace tenosynovitis of the palmar bursae. AR 629, 711–12.
> . . .
> On May 17, 2017, Dr. Dinesh Sharma performed a qualified agreed medical examination. AR 1078–84. Dr. Sharma noted increasing grip strength . . . An EMG on that date showed mildly abnormal nerve conduction study, left is greater than the right but both mild. AR 1082.
> . . .
> On February 20, 2018, Dr. Sall performed an examination . . consistent with the May 2017 NCS showing mild carpal tunnel syndrome.
> . . .
> On September 7, 2022, Dr. Erfanian noted moderate pain, positive Phalen's bilaterally, and volar wrist tenderness consistent with an EMG May 24, 2022, showing mild left medial sensory neuropathy across the left wrist. AR 2404–05.

MSJ at 6–16 (emphasis added).

The ALJ's discussion follows:

> In addition to the nerve conduction and diagnostic studies, the physical examinations also had many mitigating findings. After her carpal tunnel release on her right hand, an examination in February 2017 revealed tingling in her right fingers with mild tenderness to the thenar eminence, but negative Tinel's, full range of motion in her fingers, no triggering, no allodynia, no atrophy, no pillar tenderness, nontender thumb CMC and MP joint, and stable wrist (Ex. 1F, 7). Subsequent examinations in January and April 2019 revealed positive median compression and positive Phalen's, but negative Tinel's, no triggering and no

15

crepitus of her thumb and digits (Ex, 2F, 3). A subsequent examination 3 weeks later indicated that she had positive Tinel's with diminished sensation in the palmar aspect of her hand, but normal sensation otherwise, intact reflexes, negative Tinel sign of the ulnar nerve at the wrist, elbow and radial tunnel, negative roos test, no weakness of opposition finger abduction or flexion of the DIP joint of the fifth finger, and no wasting of the intrinsic musculature of the hand (Ex. 2F, 7). Examinations in November 2019 to March 2020 revealed no signs of atrophy or asymmetry, and she demonstrated good fine finger motor control (Ex. 12F, 8-18). She had tenderness to palpation to her carpal tunnel but had no gross deformity of the right wrist, with good muscle bulk at the thenar degrees. She had normal grip strength and finger abduction. Range of motion was diminished in extension but normal otherwise. There were no signs of atrophy or asymmetry in her hands (See e.g., 12F, 23). She reported that she was able to open a jar (Ex. 12F, 35). A more recent consultative examination in 2022 indicated that she had good dexterity, was easily able to oppose fingertips to thumb tips and make a good fist bilaterally (Ex. 21F, 8). She had equivocal Tinel's and Phalen's but only slight or a bit of discomfort with no tingling bilaterally (Ex. 21F, 8).

Similarly, for her left hand, although a physical examination revealed markedly positive Tinel sign over the left wrist in in January 2017, this was prior to her surgery, and this finding was not consistently present in subsequent examinations (Ex. 2F, 49). Another examination in February 2017 before her surgery revealed only mildly positive Tinel's and mildly positive Durkan's sign to the wrist, as well as no swelling, full range of motion, negative Finkelstein's, no triggering, no hand atrophy, and full range of motion (Ex. 1F, 7). Examinations in November 2019 to March 2020 revealed no gross deformity in her left wrist (Ex. 12F, 8-18). While she had left hand weakness of the intrinsic muscles, she had good muscle bulk at the thenar degrees. There was tenderness to palpation at the carpal tunnel but no ecchymosis, erythema, or discoloration. Range of motion in extension was somewhat diminished at 40 degrees, compared to normal 60 degrees. However, she had normal flexion, ulnar deviation, radial deviation, pronation and supination. Sensation was grossly intact to light touch and in all dermatomes. She had "4/5" grip strength and finger abduction but otherwise 5/5 strength. Reflexes were within normal limits. Subsequent examinations from June 2020 to December 2021 revealed tingling sensation and pain in her palm and finger but good fine finger motor control (Ex. 12F, 20-38; 14F, 3-19). She had only "slight" flattening of the thenar group but no intrinsic muscle wasting (See e.g., 12F, 20). There were no signs of atrophy or asymmetry in her hands (See e.g., 12F, 23). As indicated above, a prior contemporary consultative examination had some findings but also many mitigating findings (Ex, 21F, 8).

AR 2432–2433.

A summary of these medical findings follows:

Starting with mitigating findings, the ALJ identified the following:

16

- She had mild tenderness of thenar eminence
- She had good muscle bulk at the thenar degrees
- She had "slight" flattening of the thenar group but no intrinsic muscle wasting.
- Tinel's sign was negative on 3 occasions, equivocal on 1 occasion, mildly positive on 1 occasion, and positive on one occasion
- Range of motion of wrists and/or fingers was normal on 3 occasions, and on 2 occasions it was diminished in extension but otherwise normal.
- Triggering was negative on all 3 occasions.
- Allodynia was negative.
- Atrophy was absent on all 5 occasions.
- Pillar tenderness was absent.
- There was no tenderness or crepitus of the thumb and digits.
- She had intact reflexes.
- She had a negative roos test
- She had no weakness of opposition finger abduction or flexion of the DIP joint of the fifth finger,
- She could make a good fist bilaterally.
- She had no wasting of the intrinsic musculature of the hand
- She demonstrated good fine finger motor control
- She had normal flexion, ulnar deviation, radial deviation, pronation and supination.
- Sensation was grossly intact to light touch and in all dermatomes.
- She had "4/5" grip strength and finger abduction but otherwise 5/5 strength.
- Reflexes were within normal limits
- She had no ecchymosis, erythema, or discoloration.

As to positive findings, the ALJ identified the following:

- Median compression and Phalen's sign were positive.
- She had tenderness about the carpal tunnel
- She diminished sensation in the palmar aspect of her hand.
- She had diminished range of motion in extension
- She had tingling in her fingers
- She had "slight" flattening of the thenar group
- She had positive Tinel's and Durkan's sign on one occasion.
- She had some weakness of the intrinsic muscles

Plaintiff concludes:

> In other words, the ALJ rejected the severity of Gonzalez's hand pain and limitation testimony due to a lack of objective medical evidence. However, the Ninth Circuit has held that an ALJ errs by rejecting symptom testimony based solely on a lack of corroborating objective evidence. Bunnell, 947 F.2d at 345; Perez v. Astrue, 247 Fed. Appx. 931, 936 (9th Cir. 2007) ("That the degree of Perez's subjective complaints were not corroborated by the objective clinical

17

findings in the ALJ's view was of no legal moment because pain is inherently an individual phenomenon.").

MSJ at 21.

Defendant disagrees:

> …. the ALJ observed that Plaintiff "has also described improvement in her functioning from using wrists splints." Tr. 2433 (citing Tr. 3561 ("The patient has been getting about 50 to 60% pain relief with the use of her splints."), 3564). The effectiveness, frequency, and extent of treatment are also relevant factors an ALJ may consider when evaluating a claimant's allegations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *8. See also Wellington v. Berryhill, 878 F.3d 867, 876 (9th Cir. 2017) ("[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability."). As the ALJ discussed here, in November 2024, Plaintiff's treating provider described Plaintiff's wrist splints as making "a significant difference in her quality of life and function of her hands" and expressed surprise at her hesitancy to replace her splints, despite the only $15 cost. Tr. 2433 (citing Tr. 3564). The ALJ also noted that Plaintiff reported Ibuprofen helps around 40% to 70% as well as decreased neuropathic pain with Tegretol in May 2020. Tr. 2430 (citing Tr. 2139–41 ("40% pain reduction with ibuprofen….She does get benefit from ibuprofen for few hours."), 2184 ("With use of Ibuprofen [she]a gets about 70% pain relief").

Resp. at 7–8.

Defendant's response adequately refutes the suggestion that the ALJ rejected Plaintiff's symptom testimony simply on the basis that Plaintiff's complaints were not supported by corroborating   objective evidence.  Rather, as Defendant points out, the ALJ also relied on reports of significant symptom relief with wrist splints and medication.

Thus, the ALJ did not commit error as to Plaintiff's second claim.

## VI.    Conclusion

The ALJ committed error when finding that Dr. Sharma's opinion was "generally supported by the treatment notes" yet failing to properly address Dr. Sharma's opined limitation which precluded Plaintiff from forceful and repetitive use of Plaintiff's bilateral upper extremities.  This failure renders the RFC unsupported by substantial evidence.  Remand is therefore appropriate for reconsideration of Dr. Sharma's opinion as discussed above.  However,

the ALJ committed no error with respect to Plaintiff's symptom testimony.

**VII.    Order**

Substantial evidence and applicable law do not support the ALJ's finding that Plaintiff was not disabled.  Accordingly, it is ordered that:

1.  Plaintiff's motion for summary judgment (Doc. 21) is **GRANTED**.

2.  Defendant's cross motion (Doc. 23) is **DENIED.**

3.  This matter is **REMANDED** to the Commissioner of Social Security Pursuant to Sentence Four of 42 U.S.C. § 405(g).

4.  The Clerk of Court is directed to enter judgment in favor of Plaintiff and against Defendant Commissioner of Social Security.

IT IS SO ORDERED.

Dated:    **July 1, 2026**                        **/s/ Gary S. Austin**
                                                    UNITED STATES MAGISTRATE JUDGE

19